UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| SHARON McELGUNN, as personal representative of the estate of Teri Powell, | ) ) ) ) | CIV. 06-5061-KES |
| Plaintiff, | ) ) | MEMORANDUM OPINION AND ORDER |
| vs. | ) ) | |
| CUNA MUTUAL INSURANCE SOCIETY, | ) ) ) | |
| Defendant. | ) | |

Defendant, Cuna Mutual Insurance Society, moves for a new trial, or in the alternative, a remittitur of the compensatory damages award and a reduction of the punitive damages award. Plaintiff, Sharon McElgunn, as personal representative of the estate of Teri Powell, resists defendant's motion.

**BACKGROUND**

Teri Powell purchased a credit disability insurance policy from defendant. Powell became disabled and filed a claim with defendant on January 29, 2006. The insurance policy set forth the deadline for filing a claim as follows: "You must send proof to us within 90 days after your Total Disability stops. If you cannot send proof to us within 90 days, you must do so as soon as you can. Unless you have been legally incapable of filing proof of Total Disability, we won't accept it if it is filed after one (1) year from the time it should have been filed." Defendant initially denied Powell's claim on the basis that the claim was untimely filed.

Powell then hired an attorney, Jim Leach, to address the denial of her claim. Leach wrote defendant and explained that the claim was timely because Powell was still disabled and the policy says that proof must be sent within 90 days after the disability stops. Leach also explained that under South Dakota law, the late filing of a claim does not bar a claim unless the insurer can show that it has been prejudiced. On April 4, 2006, defendant's Appeals Committee reversed the denial without explanation. Defendant paid benefits to Powell for one year, from May 2002 to May 2003. Powell did not receive any further benefits until after she died.

On June 9, 2006, defendant sent Leach a letter stating that "after 12 months of disability, the definition of disability changes to capability of working any occupation for 20 hours or more per week." The letter asked various questions about Powell's part-time work, which involved making hats and petsitting. Leach responded to the letter by answering that Powell worked 15-20 hours a week at her home petsitting and making hats.[1] Leach also asked for a copy of the policy with the 20-hour provision. Defendant sent a copy of Powell's policy to Leach, but the policy did not contain a provision disqualifying an insured from being deemed totally disabled if she was capable "of working any occupation for 20 hours or more per week."

---

[1] Powell's tax returns, which were sent to defendant, showed that Powell made little or no money from petsitting and making hats.

On July 8, 2006, defendant wrote Leach and asked for information that Leach had already provided. Leach responded that he had already sent the requested information and that defendant had acknowledged receipt of it. Nonetheless, Leach provided the same information once again and informed defendant that its delay was particularly hard on Powell because she had recently been diagnosed with a recurrence of cancer. Defendant denied Powell's claim for total disability because she was "capable of returning or ha[s] returned to some type of work." In September of 2006, defendant was provided with additional medical records that showed Powell was suffering from terminal cancer. Defendant failed to pay Powell's benefits until approximately two weeks after her death on January 7, 2007.

On August 15, 2006, Powell brought suit against defendant for breach of contract and bad faith. The court granted plaintiff's motion to dismiss the breach of contract claim because defendant paid Powell's benefits on January 20, 2007. Thus, only the bad faith insurance claim remained. After an extensive trial, the jury found in favor of plaintiff and awarded compensatory damages in the amount of $200,000 and punitive damages in the amount of $6 million. The court entered judgment in favor of plaintiff. Defendant's motion followed in a timely manner.

**DISCUSSION**

**A.   New Trial**

Under Rule 59(a), the court may grant a motion for a new trial to all or any of the parties on all issues or on particular issues.  See Fed. R. Civ. P. 59(a).  The standard for granting a new trial is whether the verdict is "against the great weight of the evidence."  Butler v. French, 83 F.3d 942, 944 (8th Cir. 1996).  In evaluating a motion for a new trial under Rule 59(a), the court must determine "whether a new trial is necessary to prevent a miscarriage of justice."  Maxfield v. Cintas Corp., No. 2, 563 F.3d 691, 694 (8th Cir. 2009).  Further guidance is provided by Rule 61, which provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence–or any other error by the court or a party–is ground for granting a new trial[.] . . .  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  Fed. R. Civ. P. 61.

A new trial may be necessary because of trial error, verdicts against the weight of the evidence, or damage awards that are excessive or inadequate.  Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996).  When a district court applies the proper legal standard and finds that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable.  Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995).

### 1.     Testimony Regarding Powell's Past Experiences

Defendant argues that testimony about Powell's background, including problems with her feet and the loss of her family members in a flood, was improper under Rule 401, 402, and 403 because it invoked sympathy from the jury and was otherwise irrelevant to the issues in this case.  Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.  Evidence which is not relevant is not admissible."  Fed. R. Evid. 402.  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

The only testimony identified by defendant that involved a relevancy objection was where plaintiff was asked to describe the "physical changes or problems that [Powell] went through over the years[.]"  (Unofficial Transcript at 848-49.)[2]  And plaintiff answered, "Well, in the late '90s when we went to

_____

[2] An official transcript of the trial was not made available to the court by either party.  Thus, the court's citations to the trial transcript are based on an

movies, we had to be in the back of the theater so she could stand up, move around." (UTr. at 849.) The other testimony identified by defendant was not objected to based on relevancy.[3] The testimony was relevant to this case because it explained the extent of Powell's disabilities and why Powell purchased insurance from defendant. And the extent of Powell's disabilities was relevant for purposes of determining whether defendant acted unreasonably in denying her disability claim.

Moreover, it is unlikely that defendant was prejudiced by this type of testimony on the basis of jury sympathy for Powell or plaintiff. And defendant was insulated from any unfair prejudice because the jury was instructed by the court prior to trial that it was "not [to] allow sympathy or prejudice to influence you." (Preliminary Instructions to the Jury, Docket 438, at 2.) Thus, the testimony does not support defendant's motion for a new trial.

## 2. Plaintiff's Testimony

Defendant argues that while the court had previously ruled that medical testimony by lay witnesses was not allowed, the court nonetheless allowed plaintiff to provide medical testimony related to Powell. The testimony

---

unofficial transcript and will be in the following format (UTr. at ____.).

[3] Exhibit 6, which contained similar evidence of Powell's prior medical history and life events, was also received into evidence without objection. (UTr. at 538-39.)

identified by defendant involved the following exchange between plaintiff's attorney and plaintiff:

Q. Did you also know at the time that – did you also have any information at the time that [Powell] was struggling financially?

A. Yes.

Q. What kind of problems was she having?

A. She had no money. She wasn't able to do her pet care much. She had doctor bills. She was trying very hard to eat organic food which is very expensive.

Q. Why was she interested in organic food as opposed to something else?

. . .

A. She was trying to not heal herself, but prolong her life by taking the best care of herself that she could because she couldn't take medications. She didn't have many options.

. . .

Q. Do you know anything about – do you know why she chose not to take chemotherapy?

A. She was convinced it would have killed her.

. . .

Q. Did you ever see her do anything that suggests to you she had trouble taking medications?

. . .

A. I saw [Powell] with hives many times. She one time was taking a new medication she hadn't tried before and she asked me to stay with her for a few hours because she didn't know what the reaction was going to be. And I saw her gasping for air and that sounds a little dramatic[.]

(UTr. at 862-63.)

Defendant did not object during trial to this testimony on the basis that it was improper medical testimony. And while the testimony touched on Powell's medical condition, it only did so to explain the extent of Powell's financial vulnerability and explained why she was financially vulnerable. Powell's financial vulnerability was relevant as evidence to be considered by the jury in determining the amount of punitive damages, should any be awarded. Thus, it was not error to allow this testimony.

### 3. Insurance Expert's Testimony

Defendant also argues that the court erred in allowing plaintiff to offer medical testimony through an insurance expert. (UTr. at 438, 540-41, and 545.) This testimony, however, is not properly construed as being medical testimony because it was offered for purposes of explaining to the jury the significance of certain information found in a medical report in the context of claims determination. The testimony explained to the jury how the medical information was significant for purposes of determining whether Powell's claim

should be denied or paid.[4]  Therefore, there was no error in allowing this testimony.

### 4.    Evidence of Defendant's Failure to Produce Documents

Defendant argues that the court erred in allowing testimony and exhibits to be presented to the jury showing that defendant untruthfully answered "none" to several of plaintiff's requests for production of documents.  (UTr. at 228-298; Ex. 41; Ex. 44; and Ex. 53.)[5]  Defendant also argues that it suffered unfair prejudice when the court allowed the exhibits to represent that defendant's attorney's signature was directly below the answer "none" when the signature was actually on another page in defendant's discovery response.

The exhibits and testimony showed that defendant had answered "none"[6] in response to the request for production of documents that related to "[a]ny excel spreadsheets of time filing claims prepared by . . . Helen Koppes; Lezlee Collier; [or] Vicki Fredrickson" and "[a]ny communications either to or from the

---

[4]  The court notes that defendant elicited similar testimony, which was based on similar medical reports, from its claims handler, Nicole Posely.  (UTr. at 1041-47.)

[5]  Exhibits 42, 47, and 54, which were enlarged versions of exhibits 41, 44, and 53, were offered for demonstrative purposes only.

[6]  In addition to stating "none," exhibit 41 also states:  "Objection, overly broad and unduly burdensome.  Without waiving the objection, the answer is none."  Exhibit 44 states:  "Objection, vague.  Without waiving the aforementioned objection, the answer is none."  After the court directed plaintiff to redact the objection language from the exhibit, defendant withdrew its objection to the language.  (UTr. 230-31).

Internal Appeals Committee, or its members, relating to the time filing rule."
(Ex. 41; Ex. 44.) Exhibit 53 showed that defendant had answered "none" to the request for production of documents that related to "[a]ny documents that identify past litigation involving claims of breach of contract or bad faith against Defendant under its policies of credit disability insurance." Leach testified, however, that those responses were untrue because defendant did have those documents and that they were eventually produced.

The response of "none" was admissible because it is a statement made by a party opponent. See Fed. R. Evid. 801(d)(2)(A), (C), & (D). The testimony that the response was untrue directly related to defendant's credibility. The evidence was therefore properly admitted because it went towards defendant's credibility. And defendant's credibility was significant because the jury had to determine the truthfulness of defendant's explanations about why it denied and delayed Powell's claim.

Defendant cites Waters v. Genesis Health Ventures, Inc., 400 F. Supp. 2d 814 (E.D. Pa. 2005), for the proposition that "[e]vidence of Counsel's hostility or disputes surrounding production of documents is entirely irrelevant to the Plaintiff's race discrimination claim." Id. at 818. Waters, however, is not pertinent to this issue because the testimony and exhibits in this case were not admitted for purposes of showing any discovery disputes or the attorney's

hostility toward one another.[7]  Rather, the exhibits and testimony reflect

defendant's responses to interrogatories and document requests.  This is not

evidence of a discovery dispute.  It is evidence of a discovery response.

Defendant also argues that the evidence should be excluded because it

was unfairly prejudiced by the evidence.  Under Rule 403, "evidence may be

excluded if its probative value is substantially outweighed by the danger of

unfair prejudice[.]"  Fed. R. Evid. 403.  Here, the evidence was highly probative

of defendant's credibility.  Moreover, the court finds that any prejudice

experienced by defendant on account of its untrue response to a clear

discovery request cannot be considered "unfair" because it was an admission

that was subject to explanation by defendant.  Thus, there was no error in

allowing the testimony and exhibits to be presented to the jury.

Defendant also argues that Rule 403 prohibited the exhibit from showing

its attorney's signature directly below the answer "none."  Defendant fails,

however, to explain how it was unfairly prejudiced by the signature being on

the exhibit.  Moreover, the attorney's signature was relevant because it

demonstrated to the jury that the response, "none," was made by defendant.[8]

See Fed. R. 801(d)(2)(A), (C), & (D).  And the signature was at the bottom of the

---

[7] No evidence was presented about the fact that the documents were
produced as a result of a motion to compel.

[8] The jury was instructed that "any act or omission of the defendant's
lawyers is the act or omission of defendant."  (Final Instructions to the Jury,
Docket 455, at 6.)  The same was instructed as to plaintiff's attorneys as well.

page because the pages in between the answer and the signature were redacted to eliminate irrelevant information.[9]  If the pages had not been redacted, the signature still would have been seen with the response.  Therefore, there was no unfair prejudice because there is no dispute that the attorney's signature belonged to the discovery response, and the jury would have therefore seen the signature even if it was not moved.  Thus, Rule 403 did not preclude the exhibit from being admitted into evidence as it was.

### 5.    Evidence Related to Delayed Payment

Defendant also argues that evidence about how it delayed its payments after Powell had brought suit was also improperly allowed.  Defendant identifies exhibits 10 through 14, 18 through 25, 27, 29, and 32 through 33 as being irrelevant and unfairly prejudicial.[10]  These exhibits consisted of the following: information, which included Powell's medical records, sent from Powell's attorneys to defendant and sent from defendant's local attorneys to defendant's in-house attorneys, (Exs. 10-14, 19, 25, 27, 29, and 32-33); a

---

[9] The pages were redacted because the other responses would have confused the jury with irrelevant issues.  See Fed. R. Evid. 402, 403.

[10] Exhibits 20, 23, and 24 were not admitted into evidence.  Thus, there was no error associated with those exhibits.  Defendant also identifies a portion of Leach's testimony as being improperly allowed because it related to the Appeal's Committee, which was not relevant to Powell's claim.  (UTr. at 237-38.)  Objections to questions about the appeals committee, however, were sustained, except for the untrue answer in the response to the request for production of documents relating to communications to or from the Internal Appeals Committee as discussed previously in section 4.

motion to set a trial date at an early date on account of Powell's terminal illness, (Ex. 18); and email exchanges between defendant and plaintiff's attorneys about scheduling Powell's deposition and a trial date before Powell died from her terminal illness, (Exs. 20-24).

Exhibits 10 through 14, 19, 25, 27, 29, and 32 through 33 were properly admitted because they tended to prove that defendant had knowledge of Powell's terminal illness and still delayed paying Powell's benefits until after her death.[11] This is relevant to the issue of defendant's knowledge that it did not have a reasonable basis for delaying Powell's policy benefits. The exhibits were also relevant for purposes of responding to defendant's argument that the delayed payment of Powell's benefits was because defendant did not have all of the information that it needed to determine her eligibility for insurance benefits.

Exhibit 18 was relevant to prove that defendant had notice of Powell's terminal illness but still delayed paying Powell's benefits for several months until after her death. Thus, it was admitted, with the second paragraph redacted, because it pertained to the issue of whether defendant knew that it did not have a reasonable basis for delaying Powell's policy benefits.

---

[11] Defendant did not object to exhibit 12. Exhibit 12 was nonetheless admissible for the same reasons as the other exhibits. Thus, it was not plain error to admit the exhibit into evidence.

Exhibits 21 and 22 were emails from plaintiff's attorney to defendant's attorney that were attempts to discuss scheduling issues on account of Powell's impending death. Exhibit 21 related to Leach's testimony about his attempt to follow up after he received no response to an email that informed defendant's attorney of scheduling issues in light of Powell's cancer. (UTr. at 167.) This evidence was relevant because it tended to disprove defendant's evidence and argument that the delay of Powell's payments was caused by Leach. Moreover, the testimony associated with the exhibit was not objected to, and the exhibit itself only corroborated the testimony. Thus, even if it was error to admit the exhibit into evidence, there was little or no prejudice to defendant.

Exhibit 22 related to Leach's testimony about his attempts to provide any additional information that defendant might have needed for trial. (UTr. at 167-68.) The testimony and the supporting exhibit refuted defendant's argument that the delay in paying Powell's benefits was because Leach failed to provide all of the appropriate information. Exhibit 22 also tended to prove that defendant knew that it did not have a reasonable basis for delaying Powell's policy benefits until after her death.

Thus, exhibits 10 through 14, 18, 19, 21, 22, 25, 27, 29, and 32 through 33 were properly admitted into evidence because they directly related to whether defendant knew that it did not have a reasonable basis for the delayed payment of Powell's policy benefits. <u>See</u> <u>Dakota, Minnesota & Eastern R.R.</u>

Corp. v. Acuity, 771 N.W.2d 623, 635 (S.D. 2009) ("The appropriate inquiry for the [trial] court in determining the relevance of such evidence is whether the insurer's post-filing conduct sheds light on the reasonableness of the insurer's decision or conduct in denying insurance benefits." (emphasis added)). They also refuted defendant's argument that it had a reasonable basis for the delayed payments because it did not have sufficient information about Powell's condition. See id.

**6.     Evidence Regarding Powell's Income**

Defendant argues that it was error to admit evidence about Powell's income. (UTr. at 199-206.) Evidence about Powell's income is relevant for purposes of determining the amount of punitive damages, if any. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (discussing punitive damages and stating that "[w]e have instructed courts to determine the reprehensibility of a defendant by considering whether: . . . the target of the conduct had financial vulnerability" (citation omitted)). Thus, this evidence was properly admitted.

Defendant also argues that the definition of total disability, as the term was used in the insurance policy, was a matter of first impression under South Dakota law. And defendant argues that under South Dakota law, an insurer cannot be liable when dealing with matters of first impression. See Mudlin v.

Hills Materials Co., 742 N.W.2d 49, 54 (S.D. 2007).  This argument, however, does not provide a basis for excluding otherwise relevant evidence.

Defendant also argues that it was error for the court not to instruct the jury that an insurer cannot act in bad faith when an issue involves matters of first impression.  The instruction was properly rejected because it was contrary to South Dakota law.  See Bertelsen v. Allstate Ins. Co., 764 N.W.2d 495, 500-01 (S.D. 2009) (rejecting insurer's argument that "it cannot be liable for bad faith because [the issue was] a case of first impression for this Court" because the language in the controlling statute was "plain, unambiguous, and not susceptible to debate").  Moreover, the court finds that the instruction on bad faith adequately covered this issue by stating that "defendant may challenge claims which are fairly debatable and can be held liable only where it had knowledge or recklessly denied or delayed Powell's policy benefits without a reasonable basis."  (Final Instructions to the Jury, Docket 455, at 8.)  Thus, there was no error in not giving defendant's proposed instruction.  See Bertelsen, 764 N.W.2d at 500 (emphasizing that the real inquiry is whether "the issue was fairly debatable" (citations omitted)).

### 7.    Evidence Related to Claims in Other States

Defendant argues that evidence related to other claims in other states was erroneously admitted.  The evidence pertained to how defendant had similarly handled other claims on the basis of its time filing provision and how

other insureds had responded to defendant's denials. The evidence was therefore relevant to the issues of defendant's intent and awareness of its actions and demonstrated defendant's intent or plan with regard to how it handled Powell's claim. See Fed. R. Evid. 404(b). See also State Farm, 538 U.S. at 422 ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.") Furthermore, the evidence was relevant for purposes of determining the reprehensibility of defendant's conduct. See BMW of North America, Inc. v. Gore, 517 U.S. 559, 574 n.21 (1996) (noting that "evidence describing out-of-state transactions . . . may be relevant to the determination of the degree of reprehensibility of the defendant's conduct" (citing TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 462 n.28 (1993))).

Defendant argues that it was unfairly prejudiced by this evidence because the jury was allowed to punish it for its treatment of other individuals that were not a party to this case.[12] The court, however, clearly instructed the jury that it was to award compensatory damages based on "the amount of money which will reasonably and fairly compensate Powell's estate[.]" (Final

---

[12] Pursuant to Phillip Morris USA v. Williams, 549 U.S. 346 (2007), the court did not "authorize procedures that create[d] an unreasonable and unnecessary risk" of allowing the jury to consider similar out-of-state conduct for purposes of punishing defendant. See id. at 357.

Instructions to the Jury, Docket 455, at 12.)  With regard to punitive damages, the court specifically instructed the jury that it could "not include in your award of damages any sum that represents damages for injuries to any person other than Powell."  (Id. at 15.)  And the jury was also instructed that evidence of defendant's conduct that occurred outside of South Dakota "may be considered only in determining whether defendant's conduct occurring in South Dakota was reprehensible, and if so, the degree of reprehensibility."  See Phillip Morris USA v. Williams, 549 U.S. 346, 357 (2007) (noting that the jury "may take [conduct that risks harm to many] into account in determining reprehensibility").  As the Supreme Court recently emphasized, "juries are presumed to follow the court's instructions."  CSX Transp., Inc. v. Hensley, 129 S. Ct. 2139, 2141 (2009) (citing Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)). Thus, the court did not err in admitting the evidence about defendant's conduct in other states because it was relevant for purposes of determining reprehensibility and for purposes of demonstrating defendant's intent as to why it denied Powell's claim.

## 8.    Testimony Regarding South Dakota Law

Defendant argues that testimony about South Dakota law was improperly admitted into evidence.  The majority of the testimony complained of was not objected to at the time the testimony was solicited.  More importantly, the testimony at issue was admissible for purposes of determining

whether defendant, while processing Powell's claim, knew or should have known about South Dakota's laws on time filing, the notice prejudice rule, and the definition of disability in the insurance field. (UTr. at 1094-97, 1115-20.) Thus, the testimony was properly admitted for purposes of determining a factual issue.[13] Finally, even if the testimony was improper because it invaded the province of the judge's duty to instruct the jury as to the law, a new trial is unnecessary because the court instructed the jury to "follow the law as stated in my instructions[.]" (Docket 438, at 3.)

### 9. Admission of Defendant's Counsel's Objections and Instructions During Video Depositions

Defendant argues that the court erred in allowing the jury to observe defendant's numerous objections found throughout the designated portions of JoAnn Schonasky's videotaped deposition. Defendant also argues that the jury should not have been allowed to observe the exchange between plaintiff's attorney, defendant's attorney, and the witness, Sherry Isely, when defendant's attorney instructed the witness not to answer certain questions during her videotaped deposition.

---

[13] Defendant's alternative argument that it should have been allowed to refute this testimony with its own expert testimony about what the law was in South Dakota is without merit. As stated above, the testimony was not admitted for purposes of informing the jury about what the law was in South Dakota; it was admitted for purposes of showing that defendant knew or should have known what South Dakota's laws were with regard to timeliness and disability in the insurance field. Because defendant's expert testimony was not directed to what defendant knew or should have known, it was properly excluded.

With regard to JoAnn Schonasky's deposition, almost all of the objections were overruled. (Docket 382.) Defendant has not argued that the court erred in its rulings on those objections. Defendant has not identified any authority indicating that a jury should not be allowed to observe the objections that were overruled. Moreover, allowing the jury to see those portions of the deposition where defendant's attorney objected is no different than what the jury would see if an attorney made similar objections at trial during an examination of a witness.

With regard to Sherry Isely, it was not error for the court to allow the video deposition of Isely to be played in its entirety because the witness's demeanor and answers during the moments surrounding the exchange were relevant for purposes of allowing the jury to determine the witness's credibility.

### 10. Exclusion of Dr. Drabek's and Dr. Stacy's Testimony

Prior to trial, plaintiff moved to exclude Dr. Drabek's and Dr. Stacy's testimony, and defendant failed to respond. The court granted plaintiff's motion. Defendant later moved for reconsideration, and the motion was denied.[14] Defendant now argues that the court erred in excluding the expert testimony of Dr. Drabek and Dr. Stacy.

---

[14] The court found that the reasons set forth by defendant did not justify reconsideration under Rule 60(b)(6). See Fed. R. Civ. P. 60(b)(6) ("On motion and just terms, the court may relieve a party or its legal representative from a . . . order . . . for the following reasons: . . . (6) any other reason that justifies relief."). (UTr. at 10-11.)

Defendant did not talk to or consult with either doctor until after Powell had died. Only the facts and law that were available to defendant at the time it delayed or denied payment to Powell was relevant. See Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752, 758 (S.D. 1994) ("The jury should determine the bad faith question based on the facts and law available to [the defendant] at the time it made its decision to deny coverage." (citation omitted)). Therefore, any information that was later obtained from the doctors outside of their reports was not relevant. See id. at 758. Defendant had the doctors' reports at the time it made its decision about Powell's disability claim; thus, the reports were relevant and admissible. See id. Because the doctor's reports were admissible, defendant has not demonstrated how it was prejudiced by the exclusion of Dr. Drabek's and Dr. Stacy's testimony.

Defendant argues that the doctors should have been allowed to testify because plaintiff was allowed to offer "medical testimony." Defendant has failed to identify what "medical testimony" was offered by plaintiff. And to the extent that defendant is relying on its argument set out in section 2 and 3 above, the court rejects defendant's argument that plaintiff's and Fye's "medical testimony" warranted admitting testimony beyond what was contained in the reports of Dr. Drabek and Dr. Stacy.

**11.    Allowing the Jury to Consider Punitive Damages**

Defendant argues that the court erred in allowing the jury to consider whether punitive damages should be awarded.[15]  Defendant's argument is effectively a renewed motion for a judgment as a matter of law as to the punitive damages issue.  See Fed. R. Civ. P. 50(b).

In determining whether a judgment as a matter of law is appropriate, the facts must be viewed "in the light most favorable" to plaintiff, and "all reasonable inferences" from the facts must be drawn in plaintiff's favor.  In re Prempro Prods. Liab. Litig., 586 F.3d 547, 563 (8th Cir. 2009) (quoting Christensen v. Titan Distrib., Inc., 481 F.3d 1085, 1092 (8th Cir. 2007)).  "If conflicting inferences reasonably can be drawn from evidence, the jury is in the best position to determine which inference is correct."  Id. at 563.

Defendant argues that there was insufficient evidence under the clear and convincing standard that it had acted intentionally or with reckless disregard for the safety of Powell.[16]  See Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 837 (8th Cir. 2005) ("Under South Dakota law, a trial court may submit punitive damages to the jury when clear and convincing evidence shows a 'reasonable basis' to believe there has been willful, wanton, or

---

[15] Defendant also argues that the jury was improperly instructed on the issue of bad faith.  This argument is addressed below under section 12.

[16] Defendant also argues that there was insufficient evidence to support the jury's verdict as to the bad faith claim.  This argument is addressed below under section 22.

malicious conduct." (citing Isaac, 522 N.W.2d at 761)).  In support of this argument, defendant points out "that Powell's claim was not ultimately denied on time filing" and that "[i]t was undisputed at trial that all benefits to Powell under the contract were paid."  (Docket 478, at 12.)

Defendant's renewed motion for judgment as a matter law as to punitive damages is appropriately denied, however, because there was evidence that defendant had intentionally <u>delayed</u> Powell's payments as part of a plan or scheme that relied on an interpretation of the time filing provision that was known by defendant to be incorrect because it completely ignored the word "stops."  (Ex. 114; Ex. 115; Ex. 116; Ex. 117; Ex. 118; Ex. 122; Ex. 123; Ex. 127; Ex. 128; Ex. 129; Ex. 142 at 3; Ex. 143; Ex. 144; Ex. 145; Ex. 160; Ex. 162; Ex. 163; Ex. 164.)  There was also evidence that defendant was made aware of Powell's poor physical and mental health and <u>delayed</u> payments.[17] Additionally, there was evidence that defendant subsequently <u>delayed</u> payments once again, this time based on an interpretation of the total disability provision that was against the South Dakota Supreme Court's decision because defendant's interpretation effectively required an insured to be "wholly and continuously disable[d] and prevent[ed] . . . from performing any and every duty pertaining to any business or occupation."  <u>See</u> Lauren v. Automobile Owner's Ass'n, 92 N.W.2d 659, 662 (S.D. 1958).  <u>See also</u> Robinson v. New

---

[17] <u>See</u> section 5 above.

23

York Life Ins. Co., 6 N.W.2d 162, 165 (S.D. 1942); Hale v. Metropolitan Life Ins. Co., 273 N.W. 657, 658-59 (S.D. 1937).  And there was evidence that defendant <u>delayed</u> payments based on a 20-hour work week rule that was not in the insurance policy.  (Ex. 7 at TVP 2, 92-95, 100; UTr. at 1122).  There was also evidence that defendant had attempted to keep its plans or schemes hidden by untruthfully answering that there were no documents or spreadsheets relating to the time filing provision and that there were no documents relating to past claims under its credit disability insurance policies.[18]  Based on this evidence, the jury could reasonably conclude that defendant's delay was oppressive, fraudulent, and intentionally malicious.

Defendant relies on testimony from plaintiff's insurance expert stating that an insured could "potentially" not be disabled if she was self-employed as a dog groomer.  (UTr. at 624.)  A jury could reasonably conclude that the testimony had little or no significance because the witness merely acknowledged that there was "potential" for a self-employed dog groomer not to be disabled.  Moreover, the jury could also reasonably conclude that the testimony had little or no weight in light of the other evidence identified above.  Thus, defendant's renewed motion for judgment as a matter of law as to punitive damages is denied.

_____

[18] See section 4 above.

24

**12.    Jury Instructions**

Defendant raises several arguments with regard to the jury instructions. The jury is to be "fully and properly instuct[ed] upon all the elements of the case in light of controlling [South Dakota] law." In re Prempro Prods. Liab. Litig., 586 F.3d at 567 (quoting Wright v. Farmers Co-Op of Ark & Okla., 620 F.2d 694, 698 (8th Cir. 1980)).  When reviewing whether the instructions have been "fairly submitted" to the jury, the instructions are considered "as a whole." Id.  The court is given "broad discretion in choosing the form and language of the instructions." Id. (internal quotations and citation omitted). "[A] defendant is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction." United States v. Cruz-Zuniga, 571 F.3d 721, 725 (8th Cir. 2009) (internal quotations and citations omitted).  The jury verdict will only be reversed "if the erroneous instruction affected a party's substantial rights." In re Prempro Prods. Liab. Litig., 586 F.3d at 567 (internal quotations and citation omitted).

Defendant argues that the court erred in denying several of its proposed instructions with regard to the bad faith claim.  The instructions given to the jury followed the South Dakota Model Jury Instructions, and the instructions fully informed the jury as to the applicable South Dakota law with regard to bad faith.

Defendant also argues that the court erred in not including in the instructions the definition of total disability, as found in the insurance policy. The instruction was properly denied because it would have been an improper comment on the evidence that was otherwise available to the jury. Tyler v. Hot Springs Sch. Dist. No. 6, 827 F.2d 1227, 1231 (8th Cir. 1987) ("When a court singles out evidentiary features and emphasizes them by special instruction, it tends to mislead the jury." (citation omitted)).

Throughout its brief, defendant argues that the court erred in instructing the jury about the time filing provision because it was a matter of first impression in South Dakota.[19] In Bertelsen v. Allstate Ins. Co., 764 N.W.2d 495 (S.D. 2009), however, the South Dakota Supreme Court addressed an issue that was a matter of first impression but nonetheless found that the insurer could be liable for bad faith because of the plain language found in the applicable statute. Id. at 500-01. That same reasoning applies in this case because the time filing provision is clear that an insured has 90 days from

---

[19] The relevant portion of the jury instruction addressing the time filing provision in the insurance policy reads as follows:

> The court has construed this policy provision to be unambiguous and to require an insured to file his or her claim for disability benefits no later than 90 days after his or her total disability stopped. An insured has until one year from the time the claim should have been filed, which is 90 days after the insured's total disability stopped, to file a claim.

(Final Instructions to the Jury, Docket 455, at 10.)

26

when the disability "stops," not when it "begins" as defendant had construed it. Cf. id. Thus, the jury was properly instructed on the time filing provision.

Defendant also argues that if the time filing provision was construed by the court as being unambiguous, then it was error for the court to instruct the jury that "Under South Dakota law, where a provision of an insurance policy is fairly susceptible to different interpretations, the interpretation most favorable to the insured should be adopted."[20]  As set forth in the beginning of Final Instruction No. 9, the instruction about the time filing provision was given for purposes of determining "whether defendant had a reasonable basis to deny or delay payment of Powell's credit disability benefits[.]"  The jury was instructed that South Dakota law requires an ambiguous provision to be interpreted in a manner most favorable to the insured because defendant indicated it was going to argue "that there were things out there that occurred that led them to believe that they weren't being inaccurate" with regard to the time filing provision.  (UTr. at 1231-32.)  Thus, the jury was instructed that even if defendant considered the time filing provision to be unclear on account of events in other states, the law in South Dakota nonetheless required that the time filing provision was to be construed in favor of the insured.

---

[20] Defendant did not object to this section of Final Instruction No. 9. (UTr. at 1339-40.)

Defendant also argues that the statement in Final Instruction No. 9, that "Under South Dakota law, the notice requirements in the insurance policy should not be strictly enforced unless the delay in notification has prejudiced the insurer's ability to defend a claim[,]" was a misstatement of the law in South Dakota.  Defendant argues that the law in South Dakota is such that an insurer does not need to show prejudice when there has been a delay in receiving notice.  That argument, however, is without merit, because the South Dakota Supreme Court recognized the notice-prejudice rule in Auto-Owners Ins. Co. v. Hansen Housing, Inc., 604 N.W.2d 504, 513 (S.D. 2000).  "Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, . . . it follows neither logic nor fairness to relieve the insurance company of its obligation under the policy in such a situation." (internal quotations and citations omitted)).  Id.  See also Union Pac. R.R. v. Certain Underwriters at Lloyd's London, 771 N.W.2d 611, 618 (S.D. 2009) ("South Dakota law requires that an insurer show actual prejudice caused by an untimely notice and not just mere allegations of prejudice in order to prevail.").

Defendant also argues that the jury should have been given several additional instructions on the issue of punitive damages, including malice.[21]

_____

[21] Defendant argues that the jury's question, "What does this statement mean?  'The amount of Punitive damages must bear a reasonable relationship to the actual damages[,]' " makes it clear that the jury was improperly

(UTr. at 1224-25, 1332-36.)  Most of these proposed instructions were rejected because they were an improper comment on the evidence presented at trial and unnecessarily duplicative.  Moreover, the instruction the court did give on punitive damages and malice incorporated the South Dakota Model Jury Instructions as well as the relevant language found in the United States Supreme Court opinion State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003).  Thus, the instruction given to the jury on punitive damages and malice appropriately set forth the applicable law.

Defendant argues that the court improperly refused to give the jury a mitigation of damages instruction.  A mitigation of damages defense is an affirmative defense in South Dakota.  Sayre v. Musicland Group, Inc., 850 F.2d 350, 352-54 (8th Cir. 1988).  See also Jurgensen v. Smith, 611 N.W.2d 439, 442 (S.D. 2000).  Defendant did not raise the defense in its pleadings.  (UTr. at 1330.)  And defendant did not move to amend the pleadings before, during, or after the trial.

Defendant did, however, indicate that "with the Court's leave, we could always amend the pleadings to conform with the evidence." (UTr. at 1330-31.)

---

instructed on the punitive damages issue.  Defendant's argument lacks any explanation and is rejected.  Moreover, defendant's argument that its proposed instructions related to the issue of what constitutes a "reasonable relationship to the actual damages" is entirely without merit as the proposed instructions identified by defendant had nothing to do with actual damages or with what was "reasonable."  Defendant has not argued that the court erred in its answer to the jury's question.

The court stated that it was "too late to move to amend."  (Id. at 1331.)  Thus, for purposes of argument, the court will assume that defendant did move to amend the pleadings during the trial.  See 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1493 at 50 (2d ed. 1990) ("A formal application for leave to amend is not necessary, although a request under Rule 15(b) should indicate the intended scope of the amendment and give the other parties to the action and the court notice of what is intended.").

Defendant argues that the "matter was tried by consent" because plaintiff did not challenge the evidence indicating that Leach withheld Powell's medical records from defendant.  (Docket 478, at 24.)  Plaintiff argues that it did not consent to the affirmative defense that Powell failed to mitigate damages.  Rule 15(b)(2) is the governing rule with regard to whether an amended pleading is allowed based on a party's implied consent after the trial has begun.  See Fed. R. Civ. P. 15(b)(2).[22]

A party does not impliedly consent to an unpleaded affirmative defense when the evidence that supports the affirmative defense also relates to a matter stemming from the pleadings that was squarely at issue.  Pariser v. Christian Health Care Sys., Inc., 816 F.2d 1248, 1253 (8th Cir. 1987) ("While [the

--------

[22] Rule 15(b)(2) states in relevant part that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move . . . to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."

plaintiff] did introduce some evidence that would be relevant to a tortious-interference claim, this evidence was also relevant to [the plaintiff's] other claims, so its introduction did not provide the defendant any notice that a claim for tortious interference with contractual relations was being tried." (citation omitted)).  Here, defendant relies on unchallenged evidence that tended to prove that the delayed payments were caused by Leach's failure to provide Powell's medical records in a timely manner.  This evidence directly related to the bad faith claim pleaded in the complaint and whether defendant had a reasonable basis for denying and delaying Powell's payments.[23] Therefore, plaintiff did not give implied consent to the unpleaded affirmative defense of mitigation of damages.  Thus, defendant's motion to amend the pleadings under Rule 15(b)(2) is denied.  Sayre, 850 F.2d at 355 ("[T]he trial judge has great discretion to deny motions to amend the pleadings." (citations omitted)).

Even if the court did err in not instructing the jury on the mitigation of damages defense, that error was harmless because the jury clearly rejected defendant's argument that it had a reasonable basis for the denial and delayed payments.  Cf. Zutz v. Case Corp., 422 F.3d 764, 773 (8th Cir. 2005) ("We need not determine whether the district court abused its discretion in failing to

---

[23] Defendant argued to the jury that the evidence showed that there was no bad faith because there was a reasonable basis for the denial and delayed payments on account of Leach's failure to provide the medical records.

include an instruction on concurring cause, because any instructional error was harmless."); Jurgensen, 611 N.W.2d at 443 ("[T]o obtain a reversal for failure to give a requested instruction, an appellant has the burden of proving that the jury might and probably would have returned a different verdict had the proposed instruction been given." (citation omitted)).

Here, defendant extensively argued that the delay of Powell's payment was caused by Leach's failure to provide defendant all of the information and documentation that was in his possession. That argument, however, was clearly rejected by the jury. Because the jury found that Leach's actions did not provide a reasonable basis for the delayed payments, the jury would have most likely also rejected the argument that defendant was entitled to a reduction of damages based on Leach's actions. Moreover, the size of the punitive damages award also demonstrates that there was no harm in not giving an instruction on the defense of mitigation of damages because the jury was instructed to consider "[a]ll of the circumstances concerning the defendant's actions, including any mitigating circumstances which may operate to reduce, without wholly defeating, punitive damages." (Final Instructions to the Jury, Docket 455, at 15.)

It is clear that the jury found that Leach's actions had nothing to do with why defendant denied Powell's claim or delayed Powell's payments. Therefore, even if the jury had been instructed on the defense of mitigation of damages,

the jury would have returned a verdict in favor of plaintiff on that issue as well. Thus, the court's refusal to instruct the jury on the affirmative defense of mitigation of damages does not constitute grounds for a new trial.

Defendant also argues that the court erred in refusing to instruct the jury on the issue of contributory negligence and comparative negligence. As noted by the South Dakota Supreme Court, however,"the tort of bad faith . . . is not predicated on mere negligence[.]" Isaac, 522 N.W.2d at 760. Therefore, "the defense of contributory negligence [is] not available" against bad faith claims. Id. at 760. Thus, defendant's proposed instructions on contributory negligence and comparative fault were properly refused. See id. at 759-60.

### 13.    Admitting Certain Exhibits into Evidence

Defendant argues that numerous exhibits were erroneously admitted into evidence. The evidence about other claims was similar to plaintiff's allegations about how defendant handled Powell's claim in that defendant initially denied the claims based on untimeliness and then subsequently reversed itself.[24] Thus, the exhibits tended to prove that defendant had knowledge of how it was delaying payments based on the misapplication of the time filing provision and that defendant's handling of Powell's claim was not a mistake or accident. Therefore, the evidence was admissible for purposes of showing the intent,

---

[24] The evidence was not admitted for purposes of showing that defendant acted in conformity with how it handled prior claims.

plan, knowledge, or absence of mistake or accident with regard to defendant's actions in this case.[25]  See Fed. R. Evid. 404(b).

Any potential for unfair prejudice to defendant was addressed by the court instructing the jury that it was to award compensatory damages based on "the amount of money which will reasonably and fairly compensate Powell's estate[.]" (Final Instructions to the Jury, Docket 455, at 12.)  And with regard to punitive damages, the court specifically instructed the jury that it could "not include in your award of damages any sum that represents damages for injuries to any person other than Powell."  (Id. at 15.)  Thus, it was not error to admit the exhibits.

### 14.    Instructing the Jury on the Time Filing Provision

Defendant's argument about the instruction on the time filing provision was addressed above under section 12.

### 15.    Evidence of Ambiguity Related to the Time Filing Provision

Defendant argues that the court improperly admitted testimony regarding the ambiguity of defendant's time filing provision.  In defendant's

---

[25] Defendant relies on State Farm, 538 U.S. 408, in support of the argument that the evidence was improperly admitted.  State Farm did not address the applicability of Rule 404(b).  Rather, State Farm dealt with punitive damages, which is addressed below.

brief in support of its motion, defendant fails to identify what testimony was improperly admitted.[26]  Thus, plaintiff was unable to properly respond.

Moreover, the court rejects the merits of defendant's argument because the evidence identified by defendant in its reply brief was not admitted for purposes of showing that the time filing provision was ambiguous.  Rather, the evidence was admitted under Rule 404(b) because it tended to prove that defendant did not have a reasonable basis for delaying Powell's policy benefits and that defendant knew it did not have a reasonable basis for delaying Powell's policy benefits.  The evidence was also admitted for purposes of showing defendant's intent regarding how it handled Powell's claim, which was relevant to the issue of punitive damages.

**16.    Final Instruction No. 9**

This issue was addressed and rejected in section 12 above.

**17.    Refusal to Admit Defense Exhibits 449 and 458 Through 465**

Defendant argues that the court erred in refusing to admit defendant's exhibits 449 and 458 through 465 into evidence.  Exhibit 449 was a Virginia Market Conduct Exam that discussed "credit accident and sickness claims,"

---

[26] Defendant cites "Exhibit F: June 2, 2009, Transcript, p. 210, *et seq.*" in its supporting brief as containing improper testimony about the policy being ambiguous.  The court has reviewed that portion of the transcript and was unable to discern any testimony related to the time filing provision.  In contrast, in defendant's reply, pages 121-123, 186-187, and 484-508 of the unofficial trial transcript are identified as containing instances of improperly admitted evidence about the ambiguity of the time filing provision.

(Def.'s Ex. 449 at 23), which was not the same as the credit disability claim that was at issue in this case. Thus, the exhibit was properly refused under Rule 402 because it was not relevant to the issues in this case. Moreover, even if it was error to refuse exhibit 449 into evidence, defendant has not demonstrated how that error affected defendant's substantial rights in light of the fact that several other market conduct exams were admitted into evidence. Defendant's exhibits 458 to 465 dealt with a case involving Alabama law. That case involved numerous issues outside of a bad faith claim and a short, two-paragraph order granting partial summary judgment as to the bad faith claim without any explanation as to why partial summary judgment was entered. These exhibits were therefore properly refused under Rule 403 for the reasons set forth in this court's previous order. (Docket 415.)

**18. Evidence Pertaining to Time Periods Where Powell Did Not Claim Disability Benefits**

Defendant argues that the court should not have allowed evidence related to time periods where Powell did not claim disability benefits. Defendant raised this argument prior to trial, and it is rejected for the same reasons as were set forth in this court's prior order. (Docket 431.)

**19. Evidence of Defendant's Financial Condition**

Defendant argues that evidence of its net worth was improperly admitted and that plaintiff's argument about how to assess punitive damages should not have been permitted. "Under well-settled law, however, factors such as [a

defendant's impressive net worth] are typically considered in assessing punitive damages." TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 462 n.8 (1993). See also Schaffer v. Edward D. Jones & Co., 521 N.W.2d 921, 929 (S.D. 1994) ("Net income is an appropriate yardstick for determining punitive damages. . . . A jury should become familiar with a defendant's financial circumstances before assessing punitive damages. . . . Therefore, we find [that defendant's] income should have been submitted for the jury's consideration." (citations omitted)). In fact, defendant's attorney admitted that plaintiff had "the right to introduce evidence with respect to the net worth of the defendant[.]" (UTr. at 677.) Thus, there was no error in admitting the evidence about defendant's net worth and permitting plaintiff's argument about how the jury should assess punitive damages.[27]

### 20. Plaintiff's Closing Argument

Defendant argues that plaintiff's counsel improperly utilized the "golden rule" argument.[28] (UTr. at 1436-1445.) The court has reviewed the relevant portions of plaintiff's counsel's closing argument and concludes that the

---

[27] Defendant's other arguments with regard to the issue of punitive damages are addressed below.

[28] "A golden rule argument asks the jury to place itself in [a party's] position." Lovett v. Union Pac. R.R. Co., 201 F.3d 1074, 1083 (8th Cir. 2000) (citations omitted). "Such an argument is universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Id. at 1083 (internal quotations and citations omitted).

argument was not a golden rule argument; the argument never placed the jury in Powell's or plaintiff's position. While defendant is correct in pointing out that the court sustained defendant's objections numerous times, the court was only preventing plaintiff's counsel from potentially presenting a "golden rule" argument that might otherwise warrant a new trial. See Lovett v. Union Pac. R.R. Co., 201 F.3d 1074, 1083 (8th Cir. 2000) ("The district court has broad discretion to rule on the propriety of closing arguments[.]" (citation omitted)). Moreover, the potential for prejudice toward defendant by the argument was protected against because the jury was instructed that it was "not [to] allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you." (Docket 438, at 2.)

### 21. Cumulative Effect of the Alleged Errors

Defendant argues that the combined effect of the alleged errors warrants a new trial. First, defendant's arguments about the alleged errors were without merit as set out above. Second, the court finds that defendant's substantial rights were not affected by the alleged errors identified by defendant, whether viewed in isolation or as a whole, because they did not "substantially influence the jury's verdict." See Williams v. City of Kansas City, Mo., 223 F.3d 749, 755 (8th Cir. 2000) ("Evidentiary errors affect a party's substantial rights when the

cumulative effect of the errors is to substantially influence the jury's verdict."
(citation omitted)).

### 22.    Sufficiency of the Evidence to Support the Verdict

Defendant argues that a new trial should be ordered because there was insufficient admissible evidence to support the jury's verdict.  Defendant's argument is conclusory, and it is premised on the assumption that its challenges to the evidence and instructions were successful.

The jury was properly instructed as set out under section 12 above.  And there was also sufficient evidence to support the jury's verdict.  There was ample evidence showing that defendant lacked a reasonable basis for the delay. The evidence demonstrated that the real reason for the delay was defendant's use of an unlawful plan or scheme in South Dakota that sought to deny payments to numerous insureds based on improper and unfounded interpretations of the time filing and total disability provisions.[29]  There was also ample evidence that either defendant knew that it did not have a reasonable basis for delaying Powell's benefits or defendant acted recklessly in delaying Powell's payments by using its unlawful plan or scheme in South Dakota.[30]  And there was evidence that defendant's actions caused Powell to suffer harm or loss on account of the delayed payments in light of her financial

---

[29] See sections 4, 5, 7, and 8 above.

[30] See sections 4, 5, and 13 above.

condition.  Therefore, defendant's motion for a new trial is denied because defendant's challenges to the evidence and jury instructions were without merit or harmless, and because there was sufficient evidence to support the jury's verdict.

## B.    Compensatory Damages

Defendant argues that remittitur of the $200,000 compensatory damages award is appropriate because Powell experienced minimal out-of-pocket expenses, and the remaining amount of damages attributable to Powell's mental and emotional harm was not supported by the evidence.[31]  Plaintiff argues that the jury's verdict on the compensatory damages should not be disturbed.

In determining whether remittitur is to be awarded, "the court applie[s] [South Dakota] substantive law to determine whether the jury's award was excessive." Schaefer v. Spider Staging Corp., 275 F.3d 735, 737-38 (8th Cir. 2002) (holding that the trial court "applied the correct substantive and procedural standards in determining that a remittitur was required").  "But the court look[s] at all the trial evidence, consistent with federal law standards governing trial court review of a jury verdict." Id. at 737-38.  " '[T]he role of the district Court is to determine whether the jury's verdict is within the confines

_____

[31] The jury was instructed to fix the amount of money that reasonably and fairly compensated Powell's estate for out-of-pocket expenses, including reasonable attorney's fees and costs, and for other harm she experienced as a result of defendant's conduct, including mental and emotional harm.

set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.' " Id. at 738 (alteration in original) (quoting Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278-79 (1989)).

In South Dakota a compensatory verdict is excessive when the award is "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant[.]" Stormo v. Strong, 469 N.W.2d 816, 826 (S.D. 1991) (internal quotations and citation omitted). " '[A]wards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.' " Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 763 (8th Cir. 2003) (citation omitted). And "it must be remembered that the amount of damages to be awarded is peculiarly a question for the jury." Maryott v. First Nat'l Bank of Eden, 624 N.W.2d 96, 105 (S.D. 2001) (internal quotations omitted) (quoting Berry v. Risdall, 576 N.W.2d 1, 4 (S.D. 1998)).

After reviewing all of the evidence, the court finds that the jury's award of $200,000 is not the result of passion, partiality, prejudice, or corruption and that the award is not flagrantly outrageous and extravagant. It is undisputed

that Powell suffered $1,647.43 in out-of-pocket expenses for her initial

attorney's fees.  It is also reasonable to infer that Powell's pecuniary losses

caused her to experience mental anguish in light of her poor economic

condition.  See Athey v. Farmers Ins. Exch., 234 F.3d 357, 363 (8th Cir. 2000)

(citing Kunkel v. United Sec. Ins. Co. of N.J., 168 N.W.2d 723, 734 (S.D.

1969)).

Furthermore, there was evidence showing that Powell suffered mental

and emotional distress as a result of defendant's denial and delayed payment

of her disability insurance benefits.  Powell testified through video deposition

that she had to take out additional loans through her home line of equity credit

and liquidate her other investments because she had not received some of her

disability insurance benefits as a result of defendant's denial and delay.  And

Powell also testified that she was afraid that she would lose her house and end

up living out of her truck because she did not have enough money while her

claim was being denied or delayed.  The jury could reasonably infer that

defendant's denial and delay caused those fears.

Powell also testified that she felt like she was being abused by defendant

and that defendant's actions caused her to lose sleep.  Moreover, there was

evidence that Powell spent many of her last days worrying about defendant and

how they were treating her.  All of this resulted in Powell feeling a lot of stress

and anger.  And Powell stated that she could "feel" the anger in her stomach. The court finds that this evidence is sufficient to support the jury's award.

Defendant argues that the award must be remitted because its actions were not extreme and outrageous and that Powell did not suffer any physical manifestations that resulted from her mental distress.  These arguments, however, are without merit because they pertain to claims of intentional infliction of emotional distress and negligent infliction of emotional distress, which were not pleaded as causes of action in this case.  The issue was whether defendant had acted in bad faith, and if so, the amount of damages that are attributable to defendant's bad faith behavior.  Defendant does not identify any authority that a compensatory award for nonpecuniary damages may only be awarded upon a showing of intentional infliction of emotional distress or negligent infliction of emotional distress.  Thus, this argument is without merit.

Defendant also argues that the compensatory damages should be remitted based on the ratio of the pecuniary damages to the non-pecuniary damages.  Defendant does not cite any authority indicating that such comparisons ought to be made when reviewing an award of compensatory damages.  And the court rejects this type of analysis as an appropriate basis for remitting a jury's compensatory damages award.  Rather, the proper

analysis is whether the evidence is sufficient to support the jury's award as discussed previously.

Finally, defendant argues that there was no "qualified" medical testimony to support the conclusion that Powell suffered mental and emotional harm. Defendant does not, however, cite any authority that such testimony is needed. And plaintiff's testimony was sufficient to establish that she suffered mental and emotional harm. See Flugge v. Flugge, 681 N.W.2d 837, 845 (S.D. 2004) ("Here, whether demonstrated by physical symptoms or not, the severity of [the plaintiff's] distress could have been proven with expert testimony from a psychiatric expert, or it could simply have been proven by lay witness testimony." (internal quotation and citation omitted) (changes in original)). See also Kucia v. Se. Ark. Cmty. Action Corp., 284 F.3d 944, 947-48 (8th Cir. 2002). Thus, this argument is also without merit.

Based on the evidence relating to Powell's pecuniary losses and the mental and emotional harm that was caused by those losses and the delayed payments, the court finds that the award of $200,000 for compensatory damages was not the result of passion, partiality, prejudice, or corruption of the jury. Furthermore, the award is not flagrantly outrageous and extravagant. See, e.g., Eich, 350 F.3d at 763 (reversing trial court's decision to remit the compensatory damages based on emotional distress and reinstating jury's $200,000 verdict for a Title VII claim); Moysis v. DTG Datanet, 278 F.3d 819,

824 (8th Cir. 2002) (applying South Dakota law and upholding trial court's decision to deny motion for remittitur where jury awarded $200,000 compensatory damages award for intentional infliction of emotional distress). Thus, defendant's motion for remittitur of the compensatory damages is denied.

## C.     Punitive Damages

Defendant argues that the $6 million punitive damages award by the jury is excessive and unconstitutional.  Plaintiff argues that the punitive damages award is appropriate because there was an abundance of evidence demonstrating that defendant's conduct in this case was particularly reprehensible.  Because defendant argues that the punitive damages award is unconstitutional, the *de novo* standard of review applies.  See Williams v. ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir. 2004) ("The constitutionality of the award presents a question of law, which [is] review[ed] *de novo*.").

Unlike compensatory damages, "punitive damages . . . are aimed at deterrence and retribution."  State Farm, 538 U.S. at 416 (citations omitted).  "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."  Gore, 517 U.S. at 568 (citations omitted).  Nonetheless, "it is well established that there are procedural and substantive constitutional imitations on these awards."  State Farm, 538 U.S. at 416 (citations omitted).

The United States Supreme Court has established three "guideposts" for reviewing a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id. at 418 (citations omitted). South Dakota has incorporated a five-factor test within these three guideposts: "the amount allowed in compensatory damages, the nature and enormity of the wrong, the intent of the wrongdoer, the wrongdoer's financial condition, and all of the circumstances attendant to the wrongdoer's actions." Roth v. Farner-Bocken Co., 667 N.W.2d 651, 666 (S.D. 2003) (citation omitted).

1. **Degree of Reprehensibility, Intent of the Wrongdoer, and Nature and Enormity of the Wrong**

a. **Degree of Reprehensibility**

" 'The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' " State Farm, 538 U.S. at 419 (quoting Gore, 517 U.S. at 575). In determining the degree of reprehensibility, the United States Supreme Court has established five factors to consider. See id. These factors include whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or

was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. (citation omitted). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." Id.

### i. Physical Harm or Economic Harm

Defendant caused Powell to suffer emotional, mental, and economic harm. This evidence supports a finding that defendant's actions were reprehensible. See Moore v. American Family Mut. Ins. Co., 576 F.3d 781, 790 (8th Cir. 2009) ("We first observe that [the plaintiffs'] injuries were not limited to financial losses. . . . [T]he evidence showed that they suffered emotional distress, and [the husband] suffered from chest pain, was unable to sleep, and began to smoke more because he was accused of being an arsonist."). Powell did not, however, suffer physical harm as a direct result of defendant's actions. Thus, this factor only weighs slightly in favor of finding defendant's actions to be reprehensible.

### ii. Indifference to or a Reckless Disregard of the Health or Safety of Others

"Virtually any disabled individual is at risk of harm to their health and safety if a disability insurance carrier deprives [a disabled individual] of [his or her] benefits." Merrick v. Paul Revere Life Ins. Co., 594 F. Supp. 2d 1168, 1186 (D. Nev. 2008). Here, the evidence demonstrated that defendant had

intentionally implemented a plan to make more money by denying and delaying claims, including Powell's claim, for reasons that were unsupported by the insurance policy itself and otherwise against South Dakota law.[32] These actions demonstrate an indifference to or a reckless disregard of Powell's health or safety because it risked Powell's ability to keep a roof over her head by staying current on her monthly mortgage payment. Thus, this factor weighs in favor of finding defendant's acts to be reprehensible.

### iii.    Target of the Conduct was Financially Vulnerable

If one becomes disabled, it is reasonable to assume that the disabled person will also become financially vulnerable. And disability insurance is meant to protect against becoming financially vulnerable. Indeed, that is why credit disability insurance is purchased in the first place: to help ensure that when one becomes disabled, he or she is still able to pay the mortgage payment.[33] See Stinnett v. Nw. Mut. Life Ins. Co., 101 F. Supp. 2d 720, 723 (S.D. Ind. 2000) ("The purpose of a disability insurance policy is to protect the insured's income lost due to a disability."). Moreover, defendant was given Powell's tax return information prior to its decision to deny Powell's claim under the total disability provision. The information in the tax return further

---

[32] The evidence also showed that defendant was made aware of Powell's various diseases and illnesses, including cancer, prior to its decision to deny her claim on August 8, 2006.

[33] Defendant used similar reasoning as a selling point for its insurance. (Exs. 253, 254, and 256.)

demonstrated that Powell was financially vulnerable.[34]  And defendant's actions only exacerbated Powell's financial vulnerability.  This factor weighs heavily in favor of finding defendant's actions to be reprehensible.

### iv.   Repeated Actions or Isolated Incident

"[R]epeated misconduct is more reprehensible than an individual instance of malfeasance" when "the conduct in question replicates prior transgressions."  State Farm, 538 U.S. at 423 (internal quotations and citations omitted).  Here, there was ample evidence that defendant's actions were not an isolated incident, but rather one of many incidents in a plan or scheme to similarly deny and delay claims based on an absurd interpretation of the time filing provision and an interpretation of the total disability provision that completely disregarded South Dakota law.  In Powell's case alone, the evidence demonstrated multiple, unsupported denials and numerous, unfounded delays.  This factor weighs very heavily in favor of finding defendant's actions to be reprehensible.

### v.   Intentional Malice, Trickery, or Deceit, or Mere Accident

The evidence showed that defendant's "conduct was not accidental or inadvertent."  See Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 828 (8th Cir. 2004).  Defendant acted with intentional malice and used trickery or deceit to

---

[34] Powell's tax records reveal that her adjusted gross income was $20,751 in 2003, $21,582 in 2004, and $22,686 in 2005.  (Ex. 7 at TVP 41, 49, 64.) And that income stemmed from Powell's pension plan.  (Id.)

achieve its goal of denying and delaying Powell's claim.  Defendant first told Powell that her claim was denied because she did not file her claim within one year of when her disability began even though the policy had no such requirement.  Later, defendant cited a 20-hour work week rule as a basis for denying Powell's claim even though the policy did not contain such a provision.  Defendant also claimed that it had not received the information from Powell that it had requested, even though the evidence showed that it clearly had.  There was also evidence that defendant did not inform Powell for some time that it had denied her claim.  These actions demonstrate that defendant used trickery and deceit and that it acted with intentional malice in order to achieve its goal of wrongfully denying and delaying Powell's claim.  Thus, this factor weighs heavily in favor of reprehensibility as well.  See id. at 828 ("Because of Amana's intentional malice, trickery, [and] deceit, this case certainly falls at the high end of reprehensibility in the economic harm category of punitive action claims." (internal quotations and citation omitted) (changes in original)).

### b. Intent of the Wrongdoer and Nature and Enormity of the Wrong

"[T]he relationship of the insurer to the insured is akin to that of a fiduciary since it must give at least as much consideration to the insured's interests as it does to its own." Trouten v. Heritage Mut. Ins. Co., 632 N.W.2d 856, 864 (S.D. 2001) (citing Long v. McAllister, 319 N.W.2d 256, 262 (Iowa 1982)).  Here, the evidence revealed that defendant's intent was to make more

money at the expense of its insureds, including Powell, by using unfounded reasons to deny and delay claims even after it was made aware of Powell's financial and physical vulnerability. While the enormity of the wrong may not be very large by looking only at the pecuniary damages suffered by Powell, the intentional act of making money by improper delaying tactics and blatant misrepresentations to an individual who was generally unable to protect herself, absent hiring an attorney, is a serious and enormous wrong considering the unique relationship that exists between an insurer and an insured. See id. at 864. Moreover, there was evidence that defendant attempted to keep evidence hidden by falsely answering "none" in response to various requests for production of documents. This suggests that defendant did not want its plan to become known. Thus, this factor weighs heavily in favor of finding defendant's actions to be reprehensible.

All of the factors weigh in favor of labeling defendant's conduct as reprehensible, with some factors weighing heavily in favor of reprehensibility. The only factor that weighs against labeling the conduct as not being reprehensible is the lack of physical harm caused by defendant's actions. Thus, the "most important indicium," reprehensibility, weighs heavily in favor of upholding the jury's punitive damages award. See State Farm, 538 U.S. at 419.

### 2. Disparity Between the Actual or Potential Harm Suffered By Plaintiff and the Punitive Damages Award, the Amount Allowed in Compensatory Damages, and Defendant's Financial Condition

#### a. Disparity Between Compensatory Damages and Punitive Damages

"The Supreme Court has observed that a ratio [between compensatory damages and punitive damages] that exceeds single digits pushes the outer limits of constitutionality."[35] ConAgra Poultry Co., 378 F.3d at 799 (citing State Farm, 538 U.S. at 425)). A high ratio itself, however, does not violate the Constitution. Id. at 799 ("It is not that such a ratio violates the Constitution."). "Rather, the mathematics alerts the courts to the need for special justification. In the absence of extremely reprehensible conduct against the plaintiff[,] . . . awards in excess of ten-to-one cannot stand." Id. And awards of more than four times the amount of compensatory damages "might be close to the line of constitutional impropriety." State Farm, 538 U.S. at 425.

Here, the ratio between punitive and compensatory damages is 30-to-1. Powell's compensatory damages award, set at $200,000 by the jury, was "not a nominal amount that might excuse a higher ratio." Wallace v. DTG Operations, 563 F.3d 357, 362 (8th Cir. 2009). Therefore, the 30-to-1 ratio can withstand

---

[35] Under the second guidepost, only the harm suffered by Powell may be considered. See Phillip Morris USA, 549 U.S. at 356-57 ("We did not previously hold explicitly that a jury may not punish for the harm caused others. But we do so hold now."). Thus, the court looks to the actual damages found in the compensatory damages award.

constitutional scrutiny only if the degree of reprehensibility is sufficient in this case.  See id. at 362 ("A high ratio may be appropriate based on particularly reprehensible conduct[.]" (citing JCB, Inc. v. Union Planters Bank, NA, 539 F.3d 862, 876 (8th Cir. 2008))).

### b.      Amount Allowed in Compensatory Damages

It is undisputed that Powell only suffered  $1,647.43 in out-of-pocket expenses that were for her initial attorney's fees.  It is therefore clear that the jury's compensatory damages award was premised almost entirely on the mental and emotional harm that Powell suffered.  And the award of nearly $200,000 for emotional and mental harm has a punitive aspect in it.  See State Farm, 538 U.S. at 426 (noting that the "compensatory damages for the injury suffered here . . . likely were based on a component which was duplicated in the punitive award" because "the distress was caused by the outrage . . . the Campbells suffered at the actions of their insurer").  Thus, the large compensatory award for mental and emotional harm supports lowering the 30-to-1 ratio to avoid such duplication.

### c.      Wrongdoer's Financial Condition

"Punitive damages must be relatively large to accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing." Engels v. Ranger Bar, Inc., 604 N.W.2d 241, 247 (S.D. 2000) (internal quotations and citations omitted).  The jury's large punitive damage award

demonstrates a strong intent to deter anyone, including defendant, from behaving in a similar manner in South Dakota. The fact that defendant is extremely wealthy, however, does not save an otherwise unconstitutional punitive damages award. State Farm, 538 U.S. at 427 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."). Thus, while defendant's wealth is relevant for determining the appropriate amount for deterrence purposes, it does not justify an otherwise unconstitutional punitive damages award.

### 3. Difference between Punitive Damages and Authorized Civil Penalties and Other Relevant Circumstances

#### a. Difference between Punitive Damages and Civil Penalties

"The third guidepost . . . is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." State Farm, 538 U.S. at 428 (internal quotations and citation omitted).

Under SDCL 58-5A-67, an insurer's license and authority to do business in South Dakota may be suspended, revoked, or not renewed if there is "a violation of this chapter which makes the continued operation of an insurer contrary to the interests of policy holders or the public." As the Eighth Circuit Court of Appeals recently noted in Moore v. American Family Mutual Insurance Co., 576 F.3d 781 (8th Cir. 2009), "[a]s for civil penalties authorized or imposed in comparable cases[,] . . . [s]uspension or revocation of [insurer's] insurance license might well prove much more costly than a punitive damages award of

$1,150,000." Id. at 791 (citations omitted).  The same is true here in South Dakota.

Defendant's act of intentionally implementing a plan to initially deny all claims based on an unfounded interpretation of the time filing provision is contrary to the interests of its insureds, including Powell.  The same is true with regard to its attempt to require that Powell be completely helpless and disabled in the most literal sense in order to qualify under the total disability provision.  Defendant's loss of its insurance license in South Dakota would potentially result in millions of dollars of lost profits over time because it would no longer be able to do business in South Dakota.  While it is unclear what the exact amount of lost profits would be, SDCL 58-5A-67 makes it clear that South Dakota is willing to impose a very serious and substantial civil penalty against an insurer for violating the law in a manner that is "contrary to the interests of policy holders."  Cf. State Farm, 538 U.S. at 428 (looking at criminal penalties for purposes of determining "the seriousness with which a State views the wrongful action").

### b.      Other Relevant Circumstances

Defendant's plan was premised on the understanding that a disabled individual faces a challenging and difficult future and that the courtroom usually represents the final option.  By denying claims on an unfounded interpretation of the time filling provision, defendant would only have to

eventually pay benefits if the insured contested the denial.  In those situations, defendant would simply reverse itself and then be no worse off than it otherwise would have been.  On rare occasions, it might have to go to trial and pay more for litigation costs and perhaps for acting in bad faith.  But the worst situation for defendant is what happened here–a large punitive damages award.  Thus, lowering the punitive damages award only lessens the severity of the worst case scenario and increases the incentive to defendant to continue such behavior.

### 4.    Consideration of all Three Guideposts

The 30-to-1 ratio between the punitive damage award and the compensatory damages award requires special justification to stand.  Defendant's conduct was extremely reprehensible, but Powell was not physically harmed by defendant's conduct.  And the compensatory damages award of $200,000 contains a punitive element.  Thus, the court finds that the $6 million punitive damage award is unconstitutional.  "When faced with an award which exceeds due process limits, it is appropriate to remit it to an amount which is 'sufficiently punitive, but that does not violate notions of fundamental fairness.' " JCB, Inc., 539 F.3d at 877 (quoting Conseco Finan. Serv. Corp. v. North American Mortgage Co., 381 F.3d 811, 825 (8th Cir. 2004)).

As set out above, defendant's conduct in this case was reprehensible in every sense except for the fact that its actions did not cause Powell to suffer physical harm. In Eden Electrical, Ltd. v. Amana Co., 370 F.3d 824 (8th Cir. 2004), the Eighth Circuit Court of Appeals affirmed the trial court's reduction of punitive damages to a "ratio of slightly more than 4.5:1[.]" Id. at 829. There, the Eighth Circuit emphasized that the reduction was proper because it "was a case of economic rather than physical harm" and the defendant's "conduct did not evince a disregard for the health or welfare of others, and the fraud involved only a single incident and a single victim." Id. at 829.

In comparison, defendant's conduct here did evince a disregard for Powell's health and welfare. And defendant's fraud or deceit did involve multiple incidents of similar behavior toward other insureds as part of a plan or scheme. Thus, a 4-to-1 ratio is not appropriate because of the heightened reprehensible nature of defendant's actions. See Craig Outdoor Adver., Inc. v. Viacom Outdoor, 528 F.3d 1001, 1021 n.9 (8th Cir. 2008) (rejecting the "argument that a 4:1 multiplier is the constitutional maximum in every commercial case" (citation omitted)).

The court therefore finds that an award of $1.6 million, for a ratio of 8-to-1, appropriately deters such behavior while remaining within the confines of what is permissible under the Constitution as interpreted by the Supreme Court. See id. at 1020-21 (upholding punitive damages in excess of 8-to-1

because of the defendant's "repeated trickery and deceit, with evidence indicating an enormous company's intent to defraud Plaintiffs because of their limited financial abilities" (internal citations omitted)).

Accordingly, it is hereby

ORDERED that defendant's motion for a new trial (Docket 468) is denied.

IT IS FURTHER ORDERED that defendant's motion for remittitur of the $200,000 compensatory damages award (Docket 468) is denied.

IT IS FURTHER ORDERED that defendant's motion for remittitur of the punitive damages award (Docket 468) is granted to the extent it is reduced to $1.6 million.

Dated March 22, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE